All right, our next case is number 19-11569. Michelle Helm versus Greg Carroll et al. And we have Mr. Stubbs and Mr. Anderson for the appellants and Mr. Harp for so Mr. Stubbs, I think you're on first and you've got five minutes. Thank you, Your Honor. First of all, we're here today to ask the court to uphold two fundamental principles of qualified immunity. One being that the actions of the appellate or the defendant officers was objectively reasonable on the date of January 16, 2015, and that the law in no way was clearly established on that date. And Your Honor, it's important to note this event did not happen in the middle of the park. It happened at a concert with the record suggest that it was as it was chaotic. It was described as rambunctious. It was loud. And so taking the evidence in light most favorable to the plaintiff as we should, she was having a seizure. The cases and as this court is well aware, that what the officers face to as far as upholding qualified immunity would be what was the law back on January 16, 2015, with regard to a use of force of someone having a medical emergency. So if we if in fact, the plaintiff, the monitor, you think it was unclear, you think it was unclear whether the police could hold down a 16 year old girl who was having a seizure and then administered taser to the 16 year old girl. That was unclear in the law at the time. Your Honor, I think it's unclear. Obviously, the law is very clear that once a party is completely restrained, force cannot be used and someone was fully restrained and forced to use not one time, not two times, but three times. How many? How many times is enough? Your Honor, in this situation, the record reflects even from the declaration of the minor sister and from the from the deposition testimony of the plan for self that this is what's important to note if you don't mind me responding, that the even the declaration of the plan of sister said that I recognize when my sister is having a seizure, she saliva comes out of her mouth, her legs and arms are thrashing. And so under those circumstances in that setting, could it have been a reasonable for the officer to perceive saliva coming out of her mouth is thrashing legs and arms as resisting and fighting? Here we're we have to take the the evidence in the light most favorable to the plaintiff. Here you have the sister approaches Officer Gilliland, I believe is his name, that her sister was having a seizure and that was in the middle of the concert. He goes and approaches and I think another the other officer was with him, the Zekas. Then another individual proceeds to help take the the minor child out of the concert hall and puts her in the lobby. She then finishes having that seizure and she then they put her on a chair. As after that, then she has another seizure, where they have to restrain her in order to help her and they're holding her head. And now you have all the individuals, Carol, Kimbrough, Gilliland, and Zekas there. And in the middle of that comes Morris, who then starts saying if you don't stop, I guess having a grand mal seizure, I'm going to tase you, which he proceeds to do. Tell me exactly number one, how that is not excessive force. And tell me exactly number two, how the individuals, the other officers who knew two of them who knew that she was having a seizure, how they did not have, why should they not have intervened and told Officer Morris, do not tase her. She's having a medical seizure. Okay, thank you, Your Honor. The the recorders say, yes, you're correct, that at first some of the officers thought this young lady was having a seizure. But then the record goes on to reflect that circumstances changed. It appeared that she came out of the seizure and then became combative at that point. And even the TDA. So I don't understand that. I don't understand that argument. Because if she's not under arrest for anything, right, she's being held down because she's having seizures. So if she came out of the seizures, why were they holding her down? Right? If she came out of the seizures, and they continue to hold her down and then tase her. I mean, I think I would be combative if I were being held down for no apparent reason by police officers and then being tased. So why is the fact that she was tased if she's not under arrest? Okay, thank you, Judge. Under those circumstances, given given the saying that they were in the combativeness or the disruption or disorderly conduct, as could be perceived by a reasonable officer at that moment in time, under those circumstances, they're trying to get her to calm down and comply with orders from the officers to calm down. The orders to stop having a grand mal seizure. How exactly is that going to help you stop having a seizure that you have that you unfortunately have a predisposition to have now? May I respond, Your Honor? Yes. Okay. And it comes down to what are they perceiving at that moment in time? At the moment a taser was used, a dry stun, not a not a pronged tasering, but a dry stun at the moment. What are they perceiving? Was it a was a seizure or was just combativeness given that given what was taking place in that moment in time? Can I ask you a question, Mr. Stubbs? Because I think the critical fact for me, again, viewing the evidence in the light most favorable to the plaintiff. And the one fact that really hurts you is that Officer Gilliland told Officer Morris when he arrived that the minor T.D.H. was having a seizure. It's not like he came onto the scene, didn't know what was happening, thought she might be combative, and then decided to apply his taser. He was told, again, if you view the evidence in the light most favorable to the plaintiffs, he was told that she was having a seizure. And my question is the same as Judge Brasher's and she's having a seizure, which is an involuntary physical event. How could he reasonably use his taser against her three times under the Fourth Amendment? Your Honor, that's why we decided to Heal versus Miracle out of the Sixth Circuit, which is the only case and which also talks about someone having a medical emergency in that situation and no crime had been committed and paramedics were trying to control this person. And we have to borrow from the Sixth Circuit in that situation that even if she is having a seizure, she's a threat to herself if she doesn't calm down. And that court in the Sixth Circuit upheld the use of force in that situation. Okay, we've taken you beyond your time, but you've saved your two and a half minutes for Mr. Anderson. And may it please the court. I represent only one defendant in this case. It is Gilliland, is how you pronounce his name, Detective Gilliland, and he has only one claim against him, and that is a failure to intervene. It's a claim for which he is entitled to summary judgment, Your Honor, for several reasons, but two of them include inability, an opportunity, time to intervene. And the second is because plaintiff cannot overcome Detective Gilliland's entitlement to qualified immunity in that he was clearly involved in a police activity. And there is no case law in this sort of situation saying that an officer that is either dealing with a medical emergency or an officer dealing with a combative suspect should have stopped what he was in somehow. How is it difficult? Let me ask a question. Is your client moved? Does he not have the ability to speak? Your Honor, he absolutely has the ability. So if he has the ability to speak and he's at the head and he's holding the minor's head down, how could he not say, Officer Morris, please do not do that again. She's having a seizure. After the first time, I could say, well, maybe, you know, he didn't see it happening. But at the second time and the third time, does he not have the ability to say, please don't do that again. We don't know what this is going to do to her. And you're using force that's not necessary. Your Honor, I have several responses to that. First, he was the furthest away from Officer Morris. Second, he was not holding the head down. She's how tall was she? She's like 15 years old. She was how little was she? She's seven feet tall. Is that very far? I don't understand that argument at all. We're having a conversation here. Are you suggesting to me in any way, shape or form that because he's holding someone's head down, he's not able to tell somebody, by the way, last time I checked, she was tased on her chest, which is very near her head. So explain to me again how it's impossible for your client to tell Officer Morris, please do not tase her again. Your Honor, again, he was cradling her head because he believed she was having a seizure. That was where his focus was. He did, in fact, tell every officer that she was having a seizure. That's why he's holding her head so she doesn't harm herself. All of this is going on in a loud, chaotic sort of situation in which the crowd is coming out. And in fact, the two tases that Your Honor referenced were very quick in succession. TDH herself said they were essentially one in the same. Meanwhile, as the second tase occurred, Your Honor, TDH's mother actually climbed on Officer Gilliland's back. So given that context... First of all, I don't believe that that's what the complaint says because I believe the complaint says that she didn't even get into the lobby before she was tased. So I don't think that's accurate. And then she was handcuffed. Your Honor, that's not what the complaint says. You're absolutely correct. But it is what the deposition testimony says. And that's relatively undisputed that TDH's mother did, in fact, make her way into the lobby. But the evidence in the light most favorable to the plaintiffs, Mr. Anderson, is not that she climbed on top of an officer before she was knocked down and handcuffed, right? That's not the mother's version of events. The mother's version was discredited by the court. That is not her version. Not completely discredited. Yes, Your Honor. But certainly on that issue. But the point is, Your Honor, this is very much like your case in Gomez v. Lozano when you were in the Southern District of Florida, where you had an officer involved in a beach fight that was otherwise preoccupied. And you held that there was no opportunity to intervene. Similarly here, Justin Gilead actually was focused on trying to deal with what he thought was a medical emergency. That was his focus. He was the furthest away, and he was trying his best to help the plaintiff. And to second guess him now is in that sort of context where he doesn't have much time, where it's loud, where it's chaotic, would be inappropriate. And particularly when there is not a single case looking at it from Justin Gilead's situation that indicates that there is some law that clearly established that he should have dropped the head of this girl and somehow dove across the body of her to knock it out of an officer's hand. I think you're misunderstanding Judge Lagoa's question. Her, I think, and I don't want to Why couldn't Officer Gilliland have intervened by simply telling Officer Morris not to use the taser a second and third time on the child? Well, I think from the first to second time, your honor, there simply wasn't time. Again, TDH herself testified they happened very quickly together. It was one in the same. And didn't, but didn't more, but again, viewing the evidence in the light most favorable to the If you don't behave and start to do what you're supposed to do, I'm going to tase you again. Yes, your honor. But again, viewing the light most favorable to the evidence is taking TDH's own testimony, which indicated it was just a second. And no, that's not We are here. I'm sorry. I'm sorry. We're not here on your version of the facts. Okay. We're here on looking at the facts in the light most favorable to the plaintiff. So in order for you to prevail here, you have to take those facts. So explain to me how, again, it is impossible for your client to say to Officer Morris in between the first and two cases, you say that simultaneous almost after Officer Morris says, again, I don't do it. If you don't stop, I'm going to tase you again. What prevented your client from being able to say after Officer Morris says that put his hand out, don't do it, or just articulate that? Your honor, again, I think it's the timing and the fact that his focus was directed on controlling her head to make sure she didn't harm herself. That is the answer. So let me ask you a question. So if Officer Morris had said instead of tase, if you don't stop doing that, I'm going to kick you. Do you think that he should have then intervened at that point? What is the excessive use of force that would have been enough to say, stop doing that? Your honor, if Detective Gillian had simply been standing around and watching, that's one thing. And certainly he could have said, you can't kick her, you can't tase her, whatever. The facts here, even in light most favorable to the plaintiff, is that Officer and trying to protect the plaintiff, even under her version, from thrashing and hitting her head and causing further injury to herself because he did believe she was having a seizure. Thank you, your honor. All right. Thank you very much, Mr. Anderson. You've saved your time for rebuttal. Okay. Mr. Harp. It pleases the court, Greg Harp on behalf of the minor TDH as well as the mother, Michelle Ham. And at the onset, I would just like to try to address an issue that has been raised by the court to Mr. Gillian's attorney. And that is why Mr. Gillian did not intervene. And it's important to note that viewed in a light most favorable to the plaintiffs in this matter, Mr. Gillian, defendant Gillian started out in a helper mode. And he justifies that he was cradling her head because he knew that she was having a seizure because he had been told that by her sister. After the first tase, defendant Gillian testifies that he went from holding the minor's head to putting her into a rear chokehold. And so at the point after the first tase, and again, there were three tases, after the first tase, defendant Gillian actually went from cradling the head by his own testimony to placing her into a rear, as he described it, a rear chokehold in order to hold her while defendant Morris administered the second tase. This is a matter that there's clearly established case law that says that you should not tase. This court has repeatedly said going back to Oliver and cases in that progeny that you should not tase a non-combative restrained individual who is not trying to escape. And in this instance, you had the sister of the minor who told detective Gillian in the concert hall, my sister is having a seizure. As the court pointed out, they made their way to the lobby. Viewed in a light most favorable to the plaintiff, the lobby was not a chaotic scene. D.H., which is the sister who testifies, and that's where the court's referenced, that's her declaration, which is document 0.01-8. She testified that it was quiet in the lobby. They got to the lobby, they placed her in a chair, she fell out of the chair, and then she began another seizure. At that point, the officers began to try to help her. They admittedly were in a helper role at that point. At some point, Officer Morris came in and for whatever reason pulled out his taser, waved it in front of the minor, and said, young lady, if you don't behave, I'm going to tase you. Now, it's important also to note that Officer Morris, he believed at that point that she was experiencing a medical emergency. And the reason that that's true is because Officer Morris actually authored two reports in this matter. And in the first report that he authored, he said that he was told by Gillian that she was having a medical emergency seizures, and that he saw her legs, quote, flopping around. He didn't say she was kicking anyone. He didn't say that she was being violent. He said that she was flopping around. And then, again, for whatever reason, he pulled out his taser, and he administered three different uses of the taser to the body of a restrained 15-year-old child who, when viewed in the light most favorable to the plaintiffs, was not combative, was experiencing a medical emergency, was never arrested, and was eventually taken to the hospital. Mr. Harp, can I ask you to switch gears a minute and address a second issue? Because I want to have the attorneys for the appellants, particularly Mr. Stubbs, to be able to address it in his rebuttal. With regards to Officer Vasikas and the mother, the district court's order with regards to the arrest claim said that Officer Vasikas is entitled to summary judgment because he was not around the mother when she was knocked down, handcuffed, and arrested. If that's the case, how can he be liable for excessive force or failing to intervene for excessive force with regard to the mother? Those two things seem a little bit inconsistent to me, and maybe you can help me out. Your Honor, the explanation that I have, and I, again, would never try to get inside the mind of the district court as they're making that opinion, but the evidence, I believe, if we go back to the declaration, we see that the mother was, Gillian told Officer Vasikas to, quote, get her. The mother never made it inside of Center Stage, so the two officers outside with the mother, outside the doors of Center Stage, was Officer Vasikas and another officer named Morgan, who actually administered the tase to the kidney of the mother. It is my belief, based upon the evidence that we have before us, that Officer Vasikas is actually the person who sent the mother to the ground. Now, he did not administer the handcuffs because that was done by Officer Morgan. He did not administer the tase, but he was there and in a position to keep Officer Morgan from administering that tase to the mother after she had been knocked down in handcuffs. Didn't the district court strike the mother's declaration or affidavit as a sham where she identified Officer Vasikas as the one who had knocked her down? I don't believe that there was an affidavit. I believe that she, the district court, actually could not reconcile her testimony. I believe they found her testimony to be conflicting in the deposition. Well, but the district court, I thought that the district court found that her testimony about Officer Vasikas knocking her to the ground was a sham affidavit, that her declaration to that effect was a sham affidavit. That's page 11, footnote 4. Yes, Your Honor, you're correct and I stand corrected and I apologize for that. You're correct that at footnote 4, the district court found that there was not a way that the party could give an unambiguous question and answer to a question in the deposition and then raise an issue of mature fact. So the court did in fact disregard Ms. Hamm's testimony that Officer Vasikas was the officer who knocked her to the ground. So my question remains, which is, if Officer Vasikas is entitled to summary judgment on the false arrest claim because he wasn't around, how can he be liable for failure to intervene during the same general event? Well, I don't believe that he was awarded summary judgment because he wasn't around. I think it was just the fact that he was not held liable for knocking her to the ground because the testimony that Ms. Hamm gave in her deposition was different than the testimony on the affidavit. And I believe the affidavit included a photograph of Officer Vasikas that said, this is the officer that actually knocked me to the ground. And the district court still disregarded that because it was different testimony than what was offered in the deposition. Didn't the district court say that Officer Vasikas had waived the issue of qualified immunity? Didn't I read that correctly in the district court's opinion by not arguing that he was due qualified immunity to the excessive force claim? That's correct, Your Honor. And I believe that's found in a footnote in the district court's opinion. All right. The district court said that Officer Vasikas was not arguing that as a factual matter, he couldn't have intervened. He just argued that the law was not clearly established. Is that right? That's correct. And he only raised that issue in a reply brief and not in his initial motion for summary judgment. Right. The way I understood the briefing in the lower court was that most of the officers just argued that the use of the taser itself was not in violation of clearly established law. And they didn't, for the most part, make individualized arguments as to themselves. And that's what the district court seems to be saying here on page 30 of her opinion, that because he didn't make an argument about himself individually, given that she had rejected the argument that the use of the taser was not in violation of clearly established law, that he couldn't now just come back in a reply brief and say, oh, even if it was, I was not in a position to intervene. That's correct, Your Honor. And so the individual defendants have also raised the issue of there's no clearly established law, but this court has clearly talked about the obvious clarity rule. And we can go back to the Oliver case and that in which this court has said where the officer's conduct is so plainly seen would have used force in that situation. So even assuming that there's not clearly established law in this circuit, which there is, but even assuming for the sake of these arguments that there was not clearly established case law, there was clearly obvious clarity that in this situation to administer a taser on a non-resisting, non-combatant 15-year-old teenager who was being held down by five police officers, one of which at the second and third, at the second taser had her in a rear chokehold was clearly outside the bounds of what would be considered constitutional. Who was not under arrest and by the officer's own admission, Your Honor, testified that she was never a threat to anyone and that she was never under arrest. Even Officer Morris testified that the moments that he administered the taser, she was not a threat to him or anyone else, or even the general public. She was simply a 15-year-old child who had the unfortunate lot in life to be, to be stricken with grandma's seizures. And she, she had seizures during that event. And that's how we have reached this posture that we're in today. How long has the trial in this case been staying pending this appeal? This, the district court entered its order on March 25th, 2019 and a motion to stay was, was granted shortly thereafter. I don't have the exact date, but it was somewhere in the general nature of the time limit allowed for appeal. So from March, 2019, just a little period after that, there's been a stay issue for the trial in this case. And keeping in mind this, this event actually occurred on January 16th, 2015. And I'll entertain any questions that the court may have for me at this time. No, I think we're set. Thank you very much, Mr. Okay, Mr. Stubbs, you're back on with your two and a half minutes for rebuttal. Thank you, Your Honor. As far as the defendant, Vizekas, he is the sole defendant in the case with regard to Michelle Helms' claims. And we do believe it's fairly inconsistent that there is no evidence in the record to suggest that he even observed Michelle Helms being knocked to the ground or being tased and therefore couldn't intervene. And I wish I could, was quick enough to find the footnote. I believe we put in the original brief, summary judgment brief. We felt like we did assert the qualified immunity defense on behalf of defendant Vizekas in the case. I think you did. I think you did accept that the district court thought that you were only challenging the second prong of qualified immunity, not the first prong. In other words, you were challenging whether the law was clearly established that the use of a taser on Ms. Helms would have been excessive force, but you were not challenging the factual premise of the failure to intervene claim against him. I think that's what Judge Brasher was asking Mr. Harp about a little bit earlier. Is that what occurred or was there a recollection from your perspective? Well, it could have been my mistake, but I have a different recollection. But even if that were the case, the law certainly wasn't clearly established that if someone didn't witness an arrest or witness a tasing, they can't be responsible for failure to intervene in that situation. Even the second prong of the test, we could rely upon on behalf of Officer Vizekas in that regard. And your honors, as far as I know, there's been a lot of discussion today about holding down someone and tasing that person if they're having a seizure. That's why we started to the case of Calwood versus Jones in this case, which is as supportive from 2018. In that situation, there's somebody, a mentally ill suspect who would not cooperate. And they tased him three times, even sat on him and hogtied his legs. He went limp and died. They tased him, I think it was, I can't remember the moment. It was numerous, numerous times in that situation. And they upheld that situation to say, and even if the evidence suggests that the suspect was having trouble breathing and couldn't get up, what the officers were perceiving in that moment. In that case, that's a very, very different factual scenario, is it not? In that case, the individual in question was naked and he was running down the county road. He was walking into oncoming traffic. He was, so he was creating a safety issue for not just himself, but for others as well. I mean, that's a very different factual scenario than what we have here, correct? I understand your position, Your Honor, but in this situation with TDH, it was creating a situation in this setting. Like I said, this did not happen in a park or- How is she creating a situation when she's having a seizure on the ground? I mean, she's not, what, I don't understand that at all. That's a very different scenario where you have someone who's walking or running into incoming traffic and is naked and is running around. How is, I don't understand this, the factual scenario, how this is similar at all. I think my, the factual scenario to me is that if she is thrashing, taking the light most able to her, if she's thrashing and saliva's coming out of her mouth and it's causing more and more attention coming to it in that setting, as far as a crowd gathering, that's what I think sets this apart, or at least the similarities to- And in this case, in the case that you want to talk about, Callwood versus Jones, the individual in question actually threw an into the air and then ran away. I mean, that's a very different situation, is it not? It is, Your Honor, but in the situation with T.D.H. that she is still, I mean, I cite the Callwood case because it says even if the suspect was still moving because he couldn't breathe, under the perception of the officers at that time, and tasing him numerous times, was justified and they were entitled to qualified immunity. All right, Mr. Stubbs, thank you very much. We really appreciate it. Mr. Anderson. Thank you, Your Honor. Talking about the issue of qualified immunity, which we've mentioned a few times, we've got to demonstrate from Officer Gilead, was it a case of obvious clarity, or was there some clear case law out there that occupied with that, but still intervened to prevent the use of a taser? That's one of the reasons we cited the Miracle case. It's out of the Sixth Circuit. It admittedly is not binding. However, the court noted, and they wrote that case in 2017, that at that point, the issue of whether a taser could be used on someone experiencing a medical emergency had not been decided by any of the circuits, and that included the Eleventh Circuit. So to take that step further and suggest there is a case out there before 2017 that says an officer that is rendering medical assistance has some case that puts him on notice that he must stop rendering medical assistance to intervene before a taser is used, it simply doesn't exist. What do you say about the chokehold issue that opposing counsel raised? Yes, Your Honor. I don't believe that Officer Gilead described it as a chokehold. He did concede that he believed that TDH came out of the seizure, and he did try to restrain her, but to call it a chokehold is, I think, an inaccurate description. But, Your Honor, if there is no case law to guide Officer Gilead in this situation that puts him clearly on notice that he is supposed to stop rendering medical assistance to prevent a tasing, then, Your Honor, he's entitled to qualified immunity. You're assuming, I think, that having a case directly on point is the only way of creating clearly established law, and that's not necessarily so. I completely agree, Your Honor, but there's not even a case that is so clear in this situation as to give some reasonable notice to the officer. In fact, the Sixth Circuit, they were actually evaluating whether the use of the taser itself on someone having a medical emergency had been clearly established unconstitutional in 2017, and, of course, they concluded that it did not and had not been by any circuit in the country. For that reason, Your Honor, some judgment is appropriate for our officer, and we would request the district court be reversed. Thank you. All right. Thank you very much, Mr. Anderson. We really appreciate the argument by all three of you. Thank you. Thank you.